[Cite as *Moody v. Ohio Dept. of Mental Health & Addiction Serv.*, 2023-Ohio-4138.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| TONY MOODY | Case No. 2019-01146JD |
| Plaintiff | Magistrate Holly True Shaver |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES | |
| Defendant | |

{¶1} This case was tried to a magistrate on the issues of liability and damages. The sole remaining claim is retaliation pursuant to R.C. 4112.99. For the following reasons, the magistrate recommends judgment in favor of defendant.

**Procedural History**

{¶2} On December 28, 2021, the Tenth District Court of Appeals issued a decision and judgment entry, which affirmed, in part, this court's decision granting summary judgment to defendant on plaintiff's race and national origin discrimination claims, but reversed, in part, this court's decision granting defendant's motion for summary judgment on plaintiff's retaliation claim.

{¶3} To prove a prima facie case of retaliation, a plaintiff must establish that: "(1) the plaintiff engaged in a protected activity, (2) the employer knew the plaintiff engaged in the protected activity, (3) the employer subjected the plaintiff to an adverse employment action, and (4) a causal link existed between the protected activity and the adverse action." *Wu v. Northeast Ohio Med. Univ.*, 10th Dist. Franklin No. 18AP-656, 2019-Ohio-2530, ¶ 29. If the plaintiff demonstrates a prima facie case, the burden shifts to the employer to articulate a legitimate reason for its action. *Id.* If the employer meets that burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason was a pretext for retaliation. *Id.*

**Prima Facie Case of Retaliation**

{¶4} The Tenth District Court of Appeals found that plaintiff demonstrated that he engaged in a protected activity when he filed an OCRC/EEOC complaint in September 2018 after he received a three-day working suspension when he was late for work because he had taken his family to the zoo on a day that he thought he was scheduled to be off work. The Tenth District Court of Appeals further found that defendant knew of plaintiff's protected activity before it started the December 2018 investigations. *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, 183 N.E.3d 21, ¶ 37 (10th Dist.). The Tenth District Court of Appeals also found that plaintiff demonstrated that he was subjected to an adverse employment action for purposes of his retaliation claim: to wit, the December 2018 investigations constituted an adverse employment action because during the investigations, plaintiff was subjected to multiple police interviews; as a result of the investigations, he was charged with failing to report violations and, after a pre-disciplinary meeting, a human relations officer found there was just cause to discipline plaintiff. *Moody*, ¶ 40. Furthermore, under defendant's progressive discipline system, plaintiff potentially faced a five-day working suspension or termination. *Id.* With regard to a causal link, the Tenth District Court of Appeals found that the approximately two-month gap between the protected activity and the adverse employment action in this case permitted a finding of causation. *Moody*, ¶ 41, 42.

**Defendant's Proffered Legitimate, Nonretaliatory Reason**

{¶5} The Tenth District Court of Appeals stated the following about defendant's proffered legitimate reason for its action:

[Defendant] asserts Moody's failure to file incident reports about alleged misconduct by his coworkers was discovered when Moody was interviewed about an unrelated matter. [Defendant] alleges the December 2018 investigations were necessary because failing to file incident reports would violate its reporting policies. [Defendant] claims all discipline imposed on Moody was consistent with its progressive discipline system and suggests any discipline arising from the December 2018 investigations would have followed that system. Taken as true, [defendant's] claim that Moody violated its incident reporting policies would permit the conclusion

that [defendant] had a legitimate, non-retaliatory reason for undertaking the December 2018 investigations. Therefore, [defendant] met its burden under the second step of the *McDonnell Douglas* framework.[1]

*Moody*, ¶ 43.

### Pretext for Retaliation

**{¶6}** Regarding pretext, the Tenth District Court of Appeals stated:

Under the third step of the *McDonnell Douglas* framework, because [defendant] presented a legitimate justification for the December 2018 investigation, the burden shifts back to Moody to establish that [defendant's] explanation was a pretext for retaliation. *Dautaras [v. Abbot Laboratories,* 10th Dist. Franklin No. 11AP-706, 2012-Ohio-1709] at ¶ 49. 'In order to prevail on a claim of retaliation where the employer has articulated a legitimate, nondiscriminatory reason, the plaintiff must prove not only that the proffered reason was a pretext, but also that the reason for the employer's action was unlawful retaliation.' *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 76. 'A plaintiff may establish pretext by proving that: (1) the employer's stated reason for [the action] has no basis in fact, (2) the reason offered was not the actual reason for the [action], or (3) the reason offered was insufficient to explain the employer's action. *Id.* at ¶ 77.

Moody effectively argues [defendant's] proffered reason was insufficient to explain the December 2018 investigations. He asserts TPWs [therapeutic program workers] at Twin Valley had some discretion regarding when to file incident reports because not every infraction merited a formal incident report. Moody claims incident reports were an elevated form of reporting that automatically triggered a police investigation, whereas reporting matters to the charge nurse allowed them to be resolved informally. Moody asserted he 'generally reported workplace problems to

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d. 668 (1973).

the Charge Nurse, rather than automatically escalate all issues into Incident Reports and police investigations' and that he 'only filed Incident Reports for the most egregious conduct." (Moody Aff. at ¶ 10, Pl.'s Ex. 1.) Moody further claimed this 'was the way most such incidents were handled by my fellow TPWs.' (Moody Aff. at ¶ 10, Pl.'s Ex. 1.) In addition to his personal understanding of appropriate reporting practices, Moody cites a statement made by a registered nurse during the December 2018 investigations. The nurse told the investigator that if a TPW witnessed a patient violation she would advise the TPW to tell the registered nurse on duty about it. Construing this evidence most favorably to Moody, it creates a genuine issue of material fact regarding the incident reporting practices at Twin Valley and, by extension, whether [defendant's] justification for the December 2018 investigation (i.e., that it was necessary because Moody violated policy by failing to report workplace incidents) was merely a pretext for retaliation.

*Moody*, ¶ 44-45.

**Evidence That Tenth District Court of Appeals Relied on to Find an Issue of Material Fact**

{¶7} The statement made by a registered nurse during the December 2018 investigations that the Tenth District Court of Appeals referenced is found in the portion of the TVBH Police Investigation Report, in a statement given by RN Nancy Berlin, on December 29, 2018. The relevant portion of the document states:

Q: If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights, etc. is the TPW supposed to make out an Incident Report? (Please be specific)

A: I would say yes. This should be reported to the RN on duty.

Q: If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights issue, etc., what do you advise the TPW to do? (Please be specific)

A: Tell the RN on duty.

Plaintiff's Ex. 7, Bates No. ODMH 1116.

**Factual Basis for the Two Investigations in December 2018**

{¶8} At trial, the magistrate heard the testimony of many witnesses. However, keeping in mind the findings of the Tenth District Court of Appeals, this decision will focus on the testimony and evidence presented regarding the issues of material fact regarding pretext specifically, the incident reporting practices at Twin Valley and defendant's justification for the December 2018 investigations and January 2019 disciplinary process. To evaluate the testimony regarding pretext, the magistrate first summarizes both investigations that resulted in the 2019 pre-disciplinary meeting.

### First Investigation: No. 482-12-18, The Epithet

{¶9} The first investigation involved an allegation that TPW Anthony James verbally abused a patient named Jelisa. The witnesses who were interviewed in this investigation were a patient named Jelisa, employee Taiwo Adebayo, and employee Anthony James. Plaintiff was interviewed via email because the investigator and plaintiff worked on different shifts. In the beginning of the investigation report, it states:

> 12/6/2018 Incident Notification. On listed date, Officer Burfield was notified on an incident involving TPWs' [sic] Anthony James and Tony Moody. The complaint originated from an unrelated investigation that is currently being conducted by Chief Swartzmiller. During Chief Swartzmiller's investigation, TPW Tony Moody made the allegation of patient verbal abuse against TPW Anthony James. TPW Moody stated that he had observed TPW James call [patient] a 'Motherfucker.'

Plaintiff's Ex. 7, Bates No. ODMH 1122. Taiwo Adebayo denied hearing James call the patient anything. *Id.*, Bates No. ODMH 1123. However, Adebayo stated that she observed James and Moody "joking around" on November 27, 2018 during the shift change between 2:30 and 3:00 p.m. *Id.* When interviewed, James denied calling the patient the epithet.

> Q: I'll ask you the original question again, have you ever called TVBH Patient, Jelisa O. a motherfucker? A: No. No issue with the patient nor ever had words with the patient. I was addressing staff (Tony M.) and his

personal boundaries regarding me and touching me in an aggressive manner. The patient had no doings with this issue.

*Id.*, Bates No. ODMH 1124. When interviewed, plaintiff stated via email:

I came to work on the 12/1/2018 for second shift on k2. I placed my hand gently on Anthony J shoulder and say hi, just as he has being doing to me when ever I worked with him on the unit. He got right at my face and asked me 'what you gonna do' During this time, the patients were at the nursing station and two of the patients happens to see his rage of anger towards. Like I said last is [sic] my police report; Anthony J has always place me on a headlock, punch me in the stomach, laugh at me African back ground, called me sloppy and weak, tell me I have gone over to the other side because I am dating a white girl. There is more to this. He call me young blood and sloppy, and I called him all [old] school, we laugh about it. I just don't think he need to get so angry to the point that he wanted to fight me right at the nursing station, and in front of the patients. How professional that is?

Plaintiff's Ex. 7, Bates No. ODMH 1126. When asked when and to whom he reported James' behavior, plaintiff stated:

This last question is my favorite one. When this whole thing happen, I waited for him to calm down, so that we both can talk about the situation. After he sent me an email expressing his feelings, I then responded kindly back to him. I decided to give him till the next day to calm down so that we can talk about it. Meanwhile I told Ashley L about this. Ashley L then advise me to wait for Nina or Nancy to come the next, and then include Anthony J in the conversation. I came back on Tuesday the police call me for a statement. *Id.*

{¶10} The investigator determined that plaintiff's complaint that James called a patient a motherfucker was unfounded due to lack of evidence. Ex. 7, Bates No. ODMH 1128. Although the investigator stated that the allegation "may or may not be substantiated by [patient]," the investigator concluded that the investigation was classified

as a "he said/she said" with no credible evidence.  *Id.*  The investigation was closed and listed as unfounded.  *Id.*

**Second Investigation:  No. 507-12-18, The Christmas Incident**

{¶11} The second December 2018 investigation is about the December 25, 2018 incident with TPW Paige Sherman.  Witnesses interviewed during this investigation were the following individuals:  Plaintiff, Paige Sherman, Etchi Nkengafac, Jelea Smith, Chioma Durunna, and Nancy Berlin.  Two incident reports were filed, one from plaintiff and one from Sherman.  In plaintiff's statement to investigators, he stated that Sherman and a patient had "never gotten along because she hates the patient so much."  Plaintiff's Ex. 7, Bates No. ODMH 1095.  When asked to explain his answer, plaintiff stated that two months previously, Sherman yelled at this patient "in front of the Nursing Student Instructor's room and in front of RN Choima."  *Id.*  Plaintiff reported that Sherman favored other patients and would not do the same for this patient, and cited examples of Sherman refusing requests from this patient for a phone call or a snack or going to the Bubble Room.  *Id.*  Plaintiff reported that Sherman treated other patients "badly or unprofessionally."  *Id.*  The investigator wrote in parentheses the terms (Patient Neglect) and (Patient Verbal Abuse).  However, the magistrate finds that the investigator used parentheses to show that those were his words, not plaintiff's words, based upon the entirety of the document.  When asked whether plaintiff was present during any of those incidents, plaintiff responded: "Some of the incidents I was present and some of them I was on my break when it happened, but RN Chenio told me about it so the Nursing Instructor from Capitol one."  *Id.* Testimony at trial shows that the Nursing Instructor referred to in this report was from Capital University.  When asked about why he did not report incidents that he witnessed to his supervisor, plaintiff responded:

> I told my 'Charge Nurse' at the time of the incident.  In a chain of command first.  I talked to the co-worker about it, which I did.  The Charge Nurse's responsibility is to inform the Nursing Supervisor on these complaints.  So, I told the 'Charge Nurse' (Nancy B.) and (Etchi).  I told them about the incident where [Sherman] and [a patient] fought at the dinner area.

*Id.*

{¶12} When asked what guidance he received from the Charge Nurse, plaintiff stated, "I was told that they will talk to [Sherman] about it, that if [Sherman] continues the same behaviors, then they will bring it to our Manager of the Supervisor." Plaintiff's Ex. 7, Bates No. ODMH 1096. When asked whether he believed that Sherman had violated policy, plaintiff responded that Sherman had violated a couple of policies. *Id.* When asked: "So if [Sherman] violated policy, why was this not documented on an Incident Report and then reported to the Nursing Supervisor?" plaintiff responded:

> I told the Charge Nurses, and some of the Supervisors, which according to protocol and the chain of command should have talked to her about it or done [sic] Incident Report per the protocol. I believe you are asking the Junior Worker to the chain of responsibility of my superior workers, which to my understanding is their responsibility to document and file. Does everything here at TVBH get reported? (No.) Do they (Administration) take every time you report things? (No.) Emails and messages will testify this for me.

*Id.* When asked, "Are you stating that the nurse told you not to do an Incident Report?" plaintiff responded:

> According to the RN Supervisor, they are going to talk with the staff responsible of committing the problem. It really becomes their responsibility to handle the situation, which is as follows: (A). Talking to the staff. (B). Writing an Incident Report if they are required to do so. (C.) Document the Incident for future references. My path is to let the nurse know the situation at hand and wait for her to give the next directives.

*Id.*, Bates No. ODMH 1096-1097. When asked: "Which RN told you that they would handle it?" plaintiff responded: "Etchi (with the incident of [patient] and [Sherman] in the dining room.) Choina (with the incident of [patient] and [Sherman] at the nursing station." *Id.*, Bates No. ODMH 1097.

{¶13} In a follow-up interview, plaintiff clarified that he notified RN Nancy Berlin about a confrontation he witnessed between Sherman and a patient in the dining room. Plaintiff's Ex. 7, Bates No. ODMH 1100. Plaintiff was asked the following:

Q. You stated earlier in your statement that it is the responsibility of your supervisors to file Incident Reports, even though you are the person that witnessed such incidents. Are you away [sic] that it is a policy violating [sic] not to report, by means of an Incident Report, incidents s [sic] such as you have alleged against TPW Paige Sherman? (i.e.) Patient verbal abuse, Patient neglect, etc.?

In response, plaintiff stated:

A. I believe if the nurse is told about the incident, how is this not a report. According to TVBH policy, done [sic] we have to follow a chain of command before proceedings [sic] ? You stated policy violations, do you understand that meaning of policy violation here? Let me explain it well. It becomes a policy violation if it was not reported to anybody but kept a secret. This incident of Choina where Paige S. talked rudely to [patient] was seen by the nurse and a nursing instructed [sic] from Capital One [sic], after I came back from lunch. The incident was reported to me by the Charge Nurse. Wasn't it the nurse's responsibility to report this to management too? According to the police, it was considered not valid because I wasn't present, right? Not 'value or valid'. Who is violating TVBH Policy here? I reported the one that I had witnessed to the nurse, nothing get down [sic] by the RN. Is it not under Ohio State of Law to report anything to the nurse and won't [sic] for advanced directives from the nurse? Do any of you understand the Nursing Code of Operation?

RN reports to Supervisor.  Manager works with the decision of the RN.  We are at the bottom.

*Id.*, Bates No. ODMH 1101-1102.

RN Etchi Nkengafac stated in her interview the following relevant remarks:

Q:  If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights, etc. is the TPW supposed to make out an Incident Report?  (Please be specific)

A:  Yes, per protocol's [sic].

Q:  If a TPW witnesses any type of patient violation, such as a verbal abuse, physical abuse, patient client rights issue, etc. what do you advise the TPW to do? (Please be specific)

A:  To stay away from the patient and if possible, pull off the unit for safety issues.

*Id.*, Bates No. ODMH 1104.

Nursing Supervisor Jelea Smith stated in her interview:

Q:  If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights issue, etc. Is the TPW supposed to make out an incident report?  Please be specific.

A:  Yes.  Once this was reported to me by Tony. I gave him a direct order to fill out an incident report and give to me by 10:00 PM. On the day reported 12-25-2018.

Q:  If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights issue, etc. What do you advise the TPW to do?  Please be specific.

A:  Complete an incident report.  I notify the police and I notify nurse management.

*Id.*, Bates No. ODMH 1108.

RN Chioma Durunna stated in her interview:

Q: Have you ever been witness to TPW Paige Sherman having 'yelled at' or 'sworn at' [patient] (Please be specific)

A:  Not true, I didn't witness the Capital University instructor told me that she (Paige) was rude to patient, I didn't see her yell at patient.  I talked to her (Paige) about it and she denied it.

Q: Has TPW Tony Moody ever reported any or all of these types of behaviors, involving TPW Paige Sherman with you? (If so, please be specific and how did you handle such complaints if applicable)

A:  No

Q:  If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights, etc. is the TPW supposed to make out an Incident Report? (Please be specific)

A: Yes

Q: If a TPW witnesses any type of patient violation, such as a verbal abuse, physical abuse, patient client rights issue, etc., what do you advise the TPW to do? (Please be specific)

A:  To report to Nurse on duty, supervisor, and fill out an incident report.

Plaintiff's Ex. 7, Bates No. ODMH 1112-1114.

RN Nancy Berlin stated in her interview:

Q:  Has TPW Tony Moody ever reported any or all of these types of behaviors, involving TPW Paige Sherman with you? (If so, please be specific and how did you handles [sic] such complaints if applicable)

A:  Yes.  Tony reported that Paige was confrontational with [patient]. When I asked Paige about this, she was very offended and defensive.

Q:  Was there an Incident Report made out by TPW Tony Moody with regards to this accusation against, TPW Paige, or was there any further investigation into this?

A:  Tony stated that Paige stood outside of [patient's] bedroom and [patient] said something to Paige.  The problem that may have occurred, is that Paige could be over authoritative in Tony's view.  We had a community meeting about this.  Some staff members don't feel respected, but the patients said the same thing.  We (Nurses) don't generally go down on 2nd

shift, for commissary.  There was nothing in particular about [patient], but this was TPW Tony Moody's view of it.

Q:  If a TPW witnesses any type of patient violation, such as verbal abuse, physical abuse, patient client rights, etc. is the TPW supposed to make out an Incident Report? (Please be specific)

A:  I would say yes.  This should be reported to the RN on duty.

Q:  If a TPW witnesses any type of patient violation, such as a verbal abuse, physical abuse, patient client rights issue, etc., what do you advise the TPW to do?  (Please be specific)

A:  Tell the RN on duty.

Plaintiff's Ex. 7, Bates No. ODMH 1115-1116.

{¶14} The conclusion of the second investigation was that the allegations against Sherman were unsubstantiated.  However, plaintiff's failure to document the incidents he alleged during his interview was substantiated, as was employee personality conflicts between plaintiff and Sherman.  Specifically, the investigation report stated:

TPW Tony Moody, by his own admission, indicated numerous allegations that he claims to have noted involving abuse, neglect, or mistreatment of patients without ever having documented an Incident Report for any such allegations.  By passing information onto his supervisors, TPW Moody believes that such reporting negates him from having to administer a documented Incident Report as is necessary for proper and timely reporting.

Plaintiff's Ex. 7, Bates No. ODMH 1119.

{¶15} As a result of the facts learned during the two investigations, plaintiff was charged with a violation of Rule 4.13:  Failure to immediately report a violation of any departmental work rule, policy or procedure.  Specifically, the Notice of Pre-Disciplinary Conference states:

In December 2018, you were interviewed regarding work rule infractions.  In the process of discussing these alleged infractions, you stated to investigators that other staff had committed work rule violations in their treatment of patients.  One was an allegation that a staff member called a patient a "motherfucker" on November 27. However, you did not report this

until December 6 when you were interviewed by an investigator pertaining to an unrelated issue. Another was an allegation that a staff member was guilty of "Patient Neglect" and "Verbal Abuse", in addition to the same staff member fighting in the dinner area with a patient. However, you did not report these immediately either, and only after you were being interviewed pertaining to unrelated issues.

Defendant's Exhibit E.

**{¶16}** As a result of the pre-disciplinary meeting, a finding of just cause for discipline was issued on February 6, 2019. Plaintiff's Exhibit 8. However, no final determination of whether disciplinary action would be taken against plaintiff was made. Plaintiff received additional incident report training in March 2019 from William Eisner. Plaintiff resigned on April 1, 2019.

**{¶17}** Defendant's reporting policy is known as Hospital Directive: A-19, Reporting of Incidents, which states in relevant part:

I.    **PURPOSE**

The purpose of this policy is to establish standards and procedures for the hospital and Community Support Network (CSN) to ensure that prompt and accurate reporting, immediate evaluation, implementation of corrective/remedial action, and preventative measures take place with the occurrence of each incident.

II.   **POLICY**

It shall be the policy of Twin Valley Behavioral Healthcare (TVBH) that any incident which is not consistent with the routine care of patients, or the routine services provided by the hospital or CSN, and staff, shall be reported and investigated so that corrective/remedial action and preventative measures can be implemented.

* * *

III.  **DEFINITIONS**

* * *

2. Abuse means any act or absence of action caused by an employee inconsistent with rights which results, or could result in physical injury to a patient; * * * insulting or coarse language or gestures directed toward a client which subjects the client to humiliation or degradation; or depriving a patient of real or personal property by fraudulent or illegal means.

   a. Abuse may occur as, physical, verbal, sexual, neglect, and/or defraud.  All incidents of abuse are major.

* * *

22. Neglect means a purposeful or negligent disregard of duty imposed on an employee by statute, rule, hospital policy, position description, or professional standard and owed to a client by that employee.

* * *

## IV.  <u>REPORTING OF INCIDENTS</u>

1. All incidents shall be documented and reported in accordance with the provisions of the Ohio Administrative Code (OAC), Rule 5122-3-13, "Regional Psychiatric Hospital (RPH) Incident Reporting" and on the forms and database prescribed by OhioMHAS.

2. Investigation of Incidents

   TVBH Protective Services will be notified of all incidents according to the reporting procedure in (4) and conduct the necessary investigation. Based on the severity of the occurrence, the CEO will determine if, based on OhioMHAS policy, the incident will be classified as a major or minor incident.

* * *

4. Reporting Procedure

   a. The employee who discovers or witnesses an incident immediately contacting TVBH Protective Services, or to whom an incident is reported, is responsible for documenting the incident, cooperating in the investigation, and providing the investigating officer or staff with a complete statement or statements as needed.

b. Upon notification, by whatever means, the TVBH Protective Services department shall investigate all incidents occurring at the hospital with the exception of medication errors or lost or misplaced medicine unless theft is the cause.

c. The incident notification report * * * required by OhioMHAS shall be completed for each incident. CSN also has additional reporting responsibilities utilizing form DMHAS-0484 as appropriate. The completed incident notification form is to be given to the employee's supervisor for review.

* * *

e. Facts regarding the incident shall be reported in writing. No unsubstantiated conclusions, opinions, hearsay, assumptions, or accusations shall be included in the incident report.

Defendant's Exhibit A.

**Summary of Trial Testimony Regarding Reporting Policy**

{¶18} Melissa Hyde was a psychiatric RN who worked at Twin Valley as a charge nurse from 2017 to 2019. According to Hyde, she was trained during orientation that an incident report should be filed whenever there was a safety issue against staff or a patient or property damage. When asked whether it was her experience that an incident report had to be filed every time a rule was violated, she stated that if it did not involve safety, she would tell a manager and they would handle it. Hyde stated that TPWs inform the nurses about incidents and then nurses decide whether to have the TPW write an incident report or for the nurse to take care of the situation.

{¶19} On cross-examination, Hyde stated that she was familiar with Hospital Directive A-19 and agreed that if an employee called a patient a motherfucker, she would not consider that routine care of a patient. She agreed that withholding snacks from a patient interferes with routine patient care. However, she also stated that it was a "gray area" knowing the right thing to do. Hyde agreed that an employee calling a patient a motherfucker is verbal abuse.

{¶20} On re-direct, Hyde stated that filling out an incident report results in a talk with the safety officer.  Hyde stated that coarse language was commonplace at Twin Valley, and that she had never heard of anyone saying, "that person said a cuss word, so we had to write an incident report."  Hyde stated that if she had been in that situation, she would ask the employee what was going on and have him apologize.  If the language continued, she would get the manager involved.  Hyde described Twin Valley as a "very intense" place to work and explained that Twin Valley accepts prisoners, violent patients, and patients who are turned away from other places.  Hyde stated that she would have tried to intervene and solve the problem herself instead of writing an incident report.

{¶21} Mary Kelly Suszczynski testified that she worked at Twin Valley from 2012 to 2016 as a TPW, and that she resigned because she was not provided with enough sick leave to recover from surgery.  She stated that she was trained on how to file incident reports.  In Suszczynski's experience, anything that concerned the safety of the patient, whether medically or mentally, would be appropriate for an incident report, and the incident report was to be given to the charge nurse.  She gave examples of filing incident reports for witnessing a patient hurting themself or another person.  She stated that she filed one or two incident reports in four years.  She stated that if she heard an employee mistreating a patient, she would bring it to the nurse's attention and then file an incident report if required.  She stated that it was frowned upon to have employees writing incident reports about each other all the time and that in her experience, trying to settle differences without filing incident reports was preferred.  She stated that she did not file an incident report for every policy violation she witnessed.

{¶22} On cross-examination, Suszczynski agreed that it is not routine care for an employee to call a patient a motherfucker.  On re-direct, she stated that if an employee swore at a patient, she would not file an incident report every time.  She stated that the situation could be handled on the team level with a discussion about not talking to patients like that, and that she would try to settle the matter and move on.

{¶23} Albert Gyebi testified that he worked at Twin Valley from April 2016 to March 15, 2022 as an RN.  Gyebi stated that he was the unit charge nurse.  Gyebi stated that safety issues need to be reported immediately.  Gyebi stated that any behavior that affects the patient needs to be reported.  Gyebi testified that the work environment at Twin Valley

has a different culture, and most of the time employees are de-escalating issues so someone does not get hurt. Gyebi stated that he himself has been spat upon and cursed at by a patient, and the work environment is very challenging. Gyebi stated that if a TPW witnesses a situation, he should talk to the nurse first. If it's a safety issue, then immediately file a report.

{¶24} On cross-examination, Gyebi stated that if an employee curses at a patient, that is not the right thing to do. Gyebi stated that he would not call a patient a motherfucker. Gyebi acknowledged the policy found in Defendant's Exhibit A.

{¶25} On re-direct, Gyebi stated that he has filed incident reports when there was a safety issue, especially in situations when patients were physically injured. He estimated that he filed approximately five or six incident reports when he worked there, about one a year, and that he was never told that he needed to file more incident reports. Gyebi explained that there has to be a reason behind filing an incident report; that there are times when a patient would hit you, or you witness a fight, or there was a medication error and you were a witness. Gyebi stated that most incident reports are written about a safety issue. Gyebi added that there could be a situation where you would utter a cuss word when you are trying to relate to a patient. Gyebi testified that he resigned from Twin Valley because he felt targeted; that he was accused of making a medication error and that he felt that it was time to move on.

{¶26} Olawale Ajiboye testified that he is plaintiff's pastor. Ajiboye has a master's degree in divinity and Christian life counseling. He began counseling plaintiff in 2015 due to the depression and anxiety he experienced while working at Twin Valley. Ajiboye does not take notes during counseling and does not charge a fee. Ajiboye testified that plaintiff was his "spiritual son" and he could not estimate how many times he counseled him, but that he had many telephone conversations with plaintiff about his poor treatment at work.

{¶27} Plaintiff testified that he worked at Twin Valley as a TPW from 2013 to 2019. With regard to the December 2018 investigations, plaintiff testified as follows. Plaintiff and Anthony James, a US-born African American TPW, were talking. Plaintiff told James he was not supposed to withhold snacks from patients. A female patient named Jalisa was there. According to plaintiff, James said "get out of here, motherfucker" to the patient. Plaintiff told James not to talk to patients like that. Plaintiff pulled aside the nurses, Taiwo

and Etchi, and told them that James just called a patient a motherfucker.  Plaintiff asked the nurses to talk to James, and they said they would handle it.  The nurses said not to worry about filing an incident report.

{¶28} Two days later, an officer called plaintiff because James had reported plaintiff.  Plaintiff believes that James reported him to cover himself for calling a patient a motherfucker.  During plaintiff's interview with police, plaintiff explained that James had called a patient a motherfucker and that he had reported it to the nurses.  Plaintiff testified that the police stated in their investigation report that the incident of James calling a patient a motherfucker was not substantiated.  However, plaintiff was then written up for not filing a report that James had uttered that word about a patient.

{¶29} Plaintiff explained that he believed the RN was responsible for filing incident reports because RNs determine whether reporting was necessary.  Plaintiff felt it was sufficient for him to report James' conduct to a nurse and let the nurse decide how to handle it.

{¶30} Regarding the incident with Paige Sherman, plaintiff testified that both he and Sherman talked to the charge nurse on Christmas, and the charge nurse tried to resolve their differences.  However, the charge nurse then contacted the supervisor and the supervisor told both plaintiff and Sherman to file incident reports on each other.

{¶31} On cross-examination, plaintiff testified he was aware of Defendant's Exhibit A, Hospital Directive A-19, Reporting of Incidents, although plaintiff stated that the policy that he signed during his orientation would have been an earlier version.  Plaintiff explained that he received training on when to fill out an incident report during his orientation, and that he received verbal training in addition to the written policy.  Plaintiff acknowledged that he was charged with violating Rule 4.13: Failure to immediately report a violation of any departmental work rule, policy or procedure, as stated in Defendant's Exhibit E.  Plaintiff stated that as a result of the pre-disciplinary meeting, a finding of just cause for discipline was issued on February 6, 2019.  Plaintiff's Exhibit 8.  However, plaintiff acknowledged that Veronica Lofton, the superintendent, never made a final determination in writing about whether disciplinary action would be taken against him.  Plaintiff received additional incident report training in March 2019 from William Eisner.

Plaintiff resigned on April 1, 2019. Plaintiff never received notification that he was getting a 5-day suspension or that his employment was being terminated.

{¶32} Gideon Ihiekonye worked at Twin Valley from 2017 to 2022 as a psychiatric nurse. Gideon testified that he worked in the Moritz Unit, which was the forensic unit, while plaintiff worked in the Kosar Unit, the civil side. Gideon's understanding of the reporting policy was that an incident report was to be filed when there was physical harm to a patient, when a patient was put in restraints, when there were medication issues, or any issue that could put a patient or staff in harm's way. His understanding was that an incident report was necessary to keep a record of what was happening when the physical safety of patients or staff was at issue. Gideon stated that an incident report would not be required for swear words. In that situation, Gideon would talk to his staff about being professional. Gideon stated that if a TPW became aware of an incident where a patient was sworn at or was deprived of a snack, he would expect the TPW to discuss it with the nurse in charge and have the nurse confront the staff about it.

{¶33} William Eisner testified that he was the education coordinator at Twin Valley and that he trained plaintiff during his orientation. Eisner was aware of the reporting policy in Defendant's Exhibit A and the Ohio Administrative Code Rule 5122-3-13 about regional psychiatric hospital incident reporting found in Defendant's Exhibit D. Eisner testified that plaintiff's supervisor, Iya Ngalla, asked him to do a re-education with plaintiff as to the incident reporting policy. Eisner testified that if an employee hears another employee call a patient a motherfucker, the person who hears it would have the responsibility to report it. According to Eisner, the patient would be harmed by being called an epithet by a staff member. Eisner also testified that it would not be enough to tell a nurse about it; the policy provides that the person who witnesses the action needs to file an incident report because it prevents the report from being based on hearsay. Eisner testified that calling a patient a motherfucker is not routine patient care. Eisner also testified that if an employee is aware that another employee is withholding a snack from a patient, an incident report should be filed because withholding snacks is a violation of a patient's basic rights. Eisner stated that he and Amy Rucker RN met with plaintiff on March 1, 2019, for 45 minutes of retraining/reinforcement on writing incident reports. Eisner drafted a note about the training that he conducted, which is dated March 4, 2019. Defendant's

Exhibit G.  Part of the note states that they "stressed it is the employee's responsibility to write an incident report after witnessing an incident.  It is not enough just to tell your supervisor."  *Id.*  Eisner stated that using cuss words in front of a patient is inappropriate, whether the word is directed at a patient or a coworker.

{¶34} Robert Nugen testified that he was Bill Eisner's supervisor.  Nugen testified that if something happens that is outside of routine care, employees should write an incident report and then it would be reviewed and a decision would be made whether to conduct an investigation.  Nugen testified that if a TPW hears another employee call a patient a motherfucker, that would constitute verbal abuse and a written incident report should be given to the employee's supervisor.  Nugen stated that reporting it verbally to the nurse is not enough; it is abuse and it must be reported in writing.  Nugen further testified that if a TPW was withholding a snack from a patient, it would depend on why the snack was being withheld.  According to Nugen, if a TPW was "playing favorites," the withholding of a snack would be punitive and neglectful and not the normal routine. Nugen stated that employees received annual training on incident report writing.  Nugen stated that retraining an employee does not constitute discipline.

{¶35} Iya Ngalla testified that she is a clinical nurse manager for Twin Valley and that she has worked there since 2001.  Ngalla was plaintiff's supervisor for at least four years.  Ngalla is familiar with the policy found in Defendant's Exhibit A.  Ngalla testified that if a TPW calls a patient a motherfucker, that would constitute abuse under the policy, and she would expect a written incident report.  Ngalla testified that it must be documented in an incident report and also reported to the nurse.  Ngalla stated that everyone is trained to write an incident report and to report it to a supervisor.  Ngalla also testified that if a TPW is withholding snacks from a patient, that is an infringement on the patient's rights.  Ngalla stated that if a TPW witnessed another TPW withholding snacks, that should also be reported in a written incident report.

{¶36} Daniel Dawkins testified that he has worked at Twin Valley as a labor relations officer since April 2018.  Dawkins explained that a labor relations officer ensures compliance with policies, and when there is an allegation of a policy violation, the labor relations officer determines if there is sufficient evidence for fact finding.  Dawkins explained that the subject is interviewed, an investigation is conducted, and once the

results are received, it is determined whether discipline is warranted or a pre-disciplinary meeting is required. Dawkins testified that he is familiar with the policy in Defendant's Exhibit A, A-19 Reporting of Incidents. Dawkins testified that when employees are hired, this policy is discussed. Dawkins stated that as policies get updated, all employees are informed and are given a copy they have to sign to show that they received it.

{¶37} With regard to plaintiff, Dawkins testified that he became involved after the investigation was conducted. Dawkins scheduled the pre-disciplinary meeting, photocopied the investigations, gave the information to the pre-disciplinary officer and sent copies to the representatives. According to Dawkins, Defendant's Exhibit E is the standard pre-disciplinary notice letter. The results of the investigation were that plaintiff failed to immediately report a violation: plaintiff alleged that TPW Anthony James called a patient a motherfucker and that TPW Paige Sherman abused and neglected patients by withholding snacks from some patients and showing favoritism towards other patients.

{¶38} Dawkins explained that after a pre-disciplinary meeting occurs, the pre-disciplinary officer submits a report to the CEO, Veronica Lofton. The purpose of the meeting is to provide or refute evidence. During plaintiff's pre-disciplinary meeting, plaintiff presented a five-page letter from his attorney and stated that he was not going to comment on anything. The hearing officer found there was just cause for discipline. Dawkins testified that plaintiff was not disciplined as a result of either the investigations or the pre-disciplinary meeting, but that plaintiff received retraining from William Eisner.

{¶39} On cross-examination, Dawkins stated that Rule 4.13, failure to immediately report a violation of any departmental work rule, policy, or procedure, and, Rule 5.4 abuse, exploitation, or intimidation of any patient under the supervision of the department would apply to the issues that plaintiff failed to file an incident report about. Plaintiff's Exhibit 2 Bates No. ODMH 262-263. Dawkins noted that Paige Sherman's employment was eventually terminated during her probationary period because she was not a good fit.

**Law and Analysis**

The *McDonnell Douglas* framework 'is intended progressively to sharpen the inquiry into the elusive factual question of [unlawful retaliation].' * * * Once a plaintiff proves a prima facie case and the employer produces a

legitimate, nondiscriminatory reason, the inquiry turns to the 'specific proofs
and rebuttals of [retaliatory] motivation the parties have introduced.' * * * At
that point, therefore, the trier of fact is in the position to decide the ultimate
factual issue, i.e., whether the employer unlawfully retaliated. (Internal
citations omitted.)

*Smith v. Ohio Dept. of Public Safety*, 2013-Ohio-4210, ¶ 51, 997 N.E.2d 597 (10th Dist.).

{¶40} "The ultimate burden of persuasion always remains with the plaintiff." *Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, 23 N.E.3d 162, ¶ 27 (10th Dist.). "To prevail on a retaliation claim, a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" *EEOC v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir.2015). That means plaintiff "must present evidence from which a reasonable [trier of fact] could find that [defendant] would not have [taken the allegedly adverse employment actions] if [plaintiff] had not made [his] charge." *Id.* Plaintiff must establish "*both* that the [legitimate, non-discriminatory] reason was false *and* that [unlawful retaliation] was the real reason [for the adverse employment action.]" *Smith, supra*, at ¶ 50, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

{¶41} Upon review of the testimony and evidence presented at trial, the magistrate makes the following findings. The adverse employment actions for which plaintiff seeks recovery are both December investigations and the pre-disciplinary meeting. Initially, the magistrate finds that plaintiff failed to prove that the reasons underlying both December investigations were pretextual. Instead, the magistrate finds that both December investigations were triggered by employee incident reports, including one plaintiff himself initiated. It is undisputed that the first incident arose because of an incident report that James had filed against plaintiff. Although that incident report is not in evidence, plaintiff's testimony establishes that James was annoyed by plaintiff putting his hands on James' shoulders in a playful but aggressive way that he had done many times before. When plaintiff was interviewed in that investigation, he was explaining why James was upset with him, and that is when the allegation about James calling a patient a motherfucker was discovered. Defendant then began an investigation into James' conduct. Likewise, the Christmas incident interviews were triggered by the incident reports filed by both

plaintiff and Sherman about each other's conduct. The magistrate finds that the investigations themselves were triggered by the filing of incident reports and defendant had a duty to interview witnesses because those incident reports had been filed. Therefore, the magistrate finds that plaintiff has failed to prove that the December 2018 investigations were a pretext for retaliation, because those investigations were triggered by incident reports filed by employees of Twin Valley and defendant was obligated to investigate the underlying facts pursuant to its policies. Moreover, the magistrate finds that plaintiff has failed to present evidence to show that another reason motivated the investigations.

{¶42} However, the question then becomes whether the pre-disciplinary meeting was a pretext for unlawful retaliation. The magistrate finds that the pre-disciplinary meeting occurred because of the answers plaintiff gave during the investigative interviews and therefore, that plaintiff also failed to prove the reasons underlying the pre-disciplinary meeting were pretextual. Defendant identified an issue that plaintiff was not filing incident reports when he witnessed policy violations. Specifically, when plaintiff was interviewed about an incident report that James had filed against him, plaintiff responded by informing the investigator that James had called a patient a motherfucker, which pursuant to defendant's policy, would constitute abuse. However, plaintiff had not filed an incident report about James' conduct, which occurred nine days earlier. In addition, even though plaintiff did file an incident report about Sherman's conduct, once he was interviewed, plaintiff complained of more allegations about Sherman, such as yelling at a patient, which had occurred months prior to his Christmas incident report. During the investigations, plaintiff's conduct was called into question because the issues that he raised in his interviews showed that he was not reporting incidents of potential abuse or neglect of patients. Defendant found that plaintiff was not timely reporting allegations of abuse or neglect of patients and was only mentioning these allegations in defense of accusations that other employees were making against him.

{¶43} The evidence at trial showed that defendant's policies required an incident report to be filed when there was an allegation of abuse or neglect of a patient. Although it appears in the day-to-day operations of Twin Valley, incident reports are not filed as strictly as the policies dictate, plaintiff's understanding that he should report incidents to

a charge nurse instead of filing an incident report himself was nonetheless incorrect. The testimony of Ngalla, plaintiff's supervisor, was particularly persuasive to the magistrate to show that an incident report by the employee who witnessed the violation was required per the policy, despite plaintiff's assertions that an oral report to a supervisor would suffice. The magistrate also notes that the statements of Nkengafac, Smith, and Durunna all consistently show that their understanding of the policy was that a written incident report was required. The magistrate finds that plaintiff violated defendant's written policy found in Defendant's Exhibit A by not writing an incident report about the conduct of James and Sherman, and that the alleged adverse employment actions that defendant took against plaintiff were not pretextual. Moreover, the difference in opinion among staff about the reporting policy fails to demonstrate that defendant's proffered reason was not the real reason or was an insufficient reason for the investigations and pre-disciplinary meeting.

{¶44} Ultimately, plaintiff must prove not only that defendant's proffered reasons for the investigations and pre-disciplinary meeting were a pretext, but also that the real reason for the employer's action was unlawful retaliation. *Smith*, *supra*. Courts are not to judge whether an employer made the best or fairest decision, but to determine whether the decision would not have been made but for retaliation because of plaintiff's protected activity. *See, Mittler v. Ohiohealth Corp.*, 10th Dist. Franklin No. 12AP-119, 2013-Ohio-1634, ¶ 52, citing *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 23. Plaintiff has failed to prove that defendant's actions of finding that he violated Rule 4.13: Failure to immediately report a violation of any departmental work rule, policy or procedure, was pretext. Specifically, the magistrate finds that plaintiff has failed to prove that the investigations and pre-disciplinary meeting had no basis in fact, did not actually motivate defendant's action, or that they were insufficient to explain defendant's action. Furthermore, the magistrate finds that plaintiff has failed to prove that the real reason for the investigations and pre-disciplinary meeting was unlawful retaliation for plaintiff's filing of an OCRC/EEOC claim in September 2018 regarding his earlier three-day suspension. Plaintiff failed to present credible evidence to show a causal relationship between his earlier three-day suspension and the December 2018 investigations and pre-disciplinary meeting.

**Conclusion**

{¶45} In the final analysis, while the magistrate finds that plaintiff presented credible evidence that he suffered stress and mental anguish during his employment at Twin Valley, the magistrate also finds that plaintiff has failed to prove both pretext and that his participation in a protected activity (filing the OCRC/EEOC complaint) was a but-for cause of the December 2018 investigations and the pre-disciplinary meeting. For the foregoing reasons, the magistrate recommends judgment in favor of defendant.

{¶46} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

**Filed October 23, 2023**
**Sent to S.C. Reporter 11/16/23**